**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION No. 3:17-cv-498**

| | |
|---|---|
| CHARLOTTE-MECKLENBURG BOARD OF EDUCATION, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DISABILITY RIGHTS NORTH CAROLINA, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Charlotte-Mecklenburg Board of Education (hereinafter referred to as "CMBOE"), through counsel, hereby files this Amended Complaint for Declaratory Judgment pursuant to Federal Rules of Civil Procedure Rule 15(a)(B).

## OVERVIEW

CMBOE files this Complaint against Disability Rights of North Carolina (hereinafter referred to as "Defendant"), and requests this Court to determine the limits of Defendant's authority in accessing students' Personally Identifiable Information (hereinafter referred to as "PII"), which is confidential except in very limited circumstances. CMBOE brings this matter before the Court to directly challenge Defendant's assertion that it has unfettered authority to access the confidential records of every student in a particular school based on the claim that probable cause—created unilaterally from observations of Defendant's employees—exists. CMBOE is bound by federal, state, and local laws to protect and hold confidential the PII of its

1

students unless a statutorily defined exception exists. In support of this Complaint, CMBOE alleges the following:

## **PARTIES**

1.    Plaintiff is a corporate entity whose board members are duly elected citizens of Mecklenburg County which is charged by state law with the control and operation of the Mecklenburg County public schools. Plaintiff is also known as Charlotte-Mecklenburg Schools or CMS.

2.    Upon information and belief, Defendant is a private organization, receiving federal funding, with its primary offices located at 3724 National Drive, Suite 100, Raleigh, NC 27612. This organization was designated as the state's Protection and Advocacy Agency by Governor Mike Easley as of 2007. Defendant may be served by serving registered agent, Vicki Smith at the aforementioned address.

3.    This is a declaratory judgment action pursuant to 28 U.S.C. § 2201 for the purposes of resolving an actual controversy between the parties, as more fully appears below.

## **JURISDICTION**

4.    This action is brought pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 220, and jurisdiction in this action is based upon 28 U.S.C. § 1331, and is proper because Plaintiff is seeking an interpretation of 20 U.S.C. § 1232g, 42 U.S.C. § 15043(a)(2)(B), 29 U.S.C. § 794e, 45 C.F.R. § 1326.25, and 45 C.F.R. § 1326.19. The parties are subject to federal statutes and regulations which address the unauthorized disclosure of PII of students. While there is no specific amount in controversy between the parties at the filing of the Complaint, CMBOE is subject to federal regulations which provide for the forfeiture of certain

federal funds, and other sanctions, when PII of students is disclosed without authorization. *See* 20 U.S.C. §1232g(f); 34 C.F.R. §99.66-67.

## **BACKGROUND**

5.      On or about June 7, 2017, CMBOE received a letter from Defendant, through attorney, Kristine Sullivan (hereinafter referred to as "Sullivan"), seeking confidential student information from Metro School (hereinafter referred to as "Metro") pursuant to 29 U.S.C. § 794e (f)(2), 42 U.S.C. § 15043(a)(2)(B), 45 C.F.R. § 1326.25, and 45 C.F.R.§ 1326.19.  Metro is a school that serves students who are all cognitively disabled. *A true and correct copy of the referenced letter is attached and hereto incorporated by reference as* **Exhibit 1**.

6.      The confidential student information sought by Defendant was the Individualized Education Plans (IEP) for all students at Metro, approximately 250 students, the permission or parental waiver forms given to the school that allowed use of "wheelchairs or other devices in order to support or mitigate harm to the child . . . ", or in the alternative, the names and contact information for the parents or guardians of all Metro students.

7.      Defendant's letter asked that all identifying information be redacted and that the IEPs only contain information that described the use of assistive technology, restraint, and/or seclusion.

8.      Defendant's letter stated "Disability Rights NC has received a complaint regarding improper use of restraint" and based on said complaint, Defendant was "conducting an investigation into student care and treatment." There were no other specifics regarding the complaint.

9.      Defendant set a deadline of fifteen (15) days to comply with the demand.

3

10.      On or about June 13, 2017, J. Melissa Woods, Counsel for CMBOE, (hereinafter referred to as "Woods") spoke with Sullivan and requested an agreement to extend the deadline to July 14, 2017. Sullivan agreed to this change.

11.      On June 16, 2017, Woods and Sullivan engaged in a telephone conversation regarding the information sought by Defendant. The purpose of the conversation was to obtain clarity regarding Defendant's purported authority to access records, and to receive additional information about the alleged complaint.

12.      During the June 16, 2017 conversation, Woods asked Sullivan for details about the complaint. Sullivan stated there was not a complaint from a person, but that Defendant used the term "complaint" broadly.

13.      Sullivan further explained that probable cause was based on monitoring done while Sullivan visited Metro, and her observations to the following:

a.      A female student being offered a wheelchair by a staff member and the mother of the student replying that the student did not need it. Sullivan then observed this student "walk on her own." When an inquiry was made as to why an ambulatory student would be offered a wheelchair, the assistant principal of Metro allegedly replied: wheelchairs were used for ambulatory students for various reasons, including staff convenience;

b.      A male student in a Rifton chair[1] during class time. When an inquiry was made, the assistant principal allegedly replied: the chair was used to mobilize the student during class time; and

---

[1] An activity chair that is intended to provide comfortable **seating** with adjustable support for children and adolescents with disabilities in the classroom or at home. http://www.rehabmart.com/product/rifton-activity-chair-r840-standard-base-medium-31780.html

  c.  "the extensive number of wheelchairs, Rifton chairs, and other devices present in Metro's classrooms that constitute a restraint.[2]

14. Per Sullivan, the information provided by the assistant principal did not represent an appropriate use of said devices, and based on the observations and comments, Defendant "thinks they have gotten to the level of probable cause."

15. Woods inquired whether Defendant would be willing to narrow their request for documents to the observed students—if said students could be identified—or students whose parents had authorized use of assistive devices in the way Sullivan had observed; Sullivan agreed to consider the narrowing the records request.

16. Woods also informed Sullivan that CMBOE would be willing to correct any deficiencies, if they could be identified, and cooperate with any investigation.

17. Although the assistant principal who spoke to Defendant's employees during the above referenced visit admits to stating that assistive devices are sometimes used for convenience, she denies stating that "convenience" was for staff purposes.

18. The Individualized Education Plans (IEPs) for some students at Metro allow for the use of assistive technology devices, such as wheelchairs, for ambulatory students, at the student's convenience, when there is a risk of safety to the student.

19. On June 23, 2017, Sullivan sent an email to Woods refusing to narrow the request because there "was probable cause regarding **all** the students at Metro." (emphasis added). *A true and correct copy of the referenced email is attached and hereto incorporated by reference as* **Exhibit 2**.

---

[2] This information was conveyed not in the phone conversation, but in the email that was dated June 16, 2017. *See* **Exhibit 7**.

20.     On July 13, 2017, CMBOE mailed Defendant the redacted IEPs of all students who were enrolled at Metro.

21.     Also, on July 13 2017, CMBOE, through Woods, sent a letter, explaining why CMBOE had provided the requested documents and advising Defendant that CMBOE did not agree with Defendant's determination of probable cause. CMBOE also reiterated that Defendant was not entitled to PII regarding every student at Metro and promised strict scrutiny of future requests. *A true and correct copy of the referenced letter is attached and hereto incorporated by reference as* **Exhibit 3.**

22.     On August 3, 2017, Defendant sent a letter in response to CMBOE's July 13, 2017 letter. *A true and correct copy of the referenced letter is attached and hereto incorporated by reference as* **Exhibit 4**.

23.     In the letter,  Defendant contends it has probable cause to believe that abuse and/or neglect occurred at Metro and demanded the names and contact information for the parents or guardians of all students be provided to Defendant within three (3) business days.

24.     In the letter, Sullivan claimed Woods had inaccurately recounted the telephone conversation on June 16, and denied the alleged probable cause was solely based on observations of Defendant's employees and statements by the assistant principal.

25.     Although there was no new details provided, Defendant claimed there existed a report which constitutes a complaint.

26.     On August 9, 2017, CMBOE sent a response to the letter dated August 3, 2017, requesting details of the complaint or report upon which Defendant based probable cause and refusing the demand for parent or guardian information because a release of this information would violate the Family Educational Rights and Privacy Act (FERPA) and CMBOE Policies. *A*

*true and accurate copy of the letter is attached hereto and incorporated by reference as* **Exhibit 5**.

27.     Defendant responded on August 14, 2017, stating that Protection and Advocacy Agencies, such as the Defendant, have the final authority regarding the determination of probable cause, and are not required to disclose the basis for probable cause. *A true and accurate copy of the letter is attached hereto and incorporated by reference as* **Exhibit 6**.

28.     This letter, however, again stated that the probable cause for Defendant's request for the information at Metro was based on observations and "received information."

### Count 1: Declaratory Judgment regarding FERPA

29.     CMBOE restates and incorporates by reference each of the preceding paragraphs.

30.     The information Defendant seeks is PII as defined by FERPA and protected by the mandates of that statute.[3]

31.     FERPA provides the circumstances by which PII can be released without parental consent.[4] Release of this information to Defendant, acting as a Protection and Advocacy agency, is not an exception set forth in FERPA.

32.     Defendant essentially asserts that the Protection and Advocacy statutes overrule FERPA, but have no controlling authority to support this assertion.

33.     The Fourth Circuit has not addressed the authority of Protection and Advocacy agencies to obtain PII from a public school.

34.     By providing the information sought by the Defendant, CMBOE would breach the rights of the students under its protection and violate federal law which can lead to the loss of federal funds required for the delivery of essential educational services.

---

[3] 20 U.S.C. § 1232g(a) et. seq.
[4] *Id.* at (b)(1) et. seq.

35.     Due to the parties' disagreement regarding the interpretation of the confidentiality provision of FERPA and whether, or under what circumstances, CMBOE should release the information demanded by the Defendant, CMBOE requests the Court's interpretation of the Developmental Disabilities Act (DDA) and Protection and Advocacy of Individual Rights (PAIR), as those statutes relate to FERPA, and whether CMBOE is required to release the information demanded by Defendant.

## Count 2: Declaratory Judgment Regarding Probable Cause

36.     CMBOE restates and incorporates by reference each of the preceding paragraphs.

37.     Defendant interprets the federal statutes regarding access to records very broadly and relies heavily on authority from outside the Fourth Circuit to support its perceived powers.[5]

38.     However, Defendant's authority to access records of disabled individuals is limited to three circumstances: 1) when the individual is a client; 2) when the individual is without a parent or guardian to authorize access or the individual is unable to authorize access; or 3) when there has been a complaint or probable cause exists to believe an individual has been subject to abuse or neglect. [6]

39.     In an email dated June 16, 2017, Defendant admitted that the first of the three enumerated circumstance is not applicable to this matter.[7] *A true and correct copy of the referenced email is attached and hereto incorporated by reference as* **Exhibit 7**.

40.     The second circumstance is not satisfied because, upon information and belief, all students at Metro have parents or guardians. CMBOE, therefore, rejects Defendant's contention that the second condition is relevant to this matter.

---

[5] *See* **Exhibit 1**.
[6] 42. U.S.C. § 15043 (a)(2)(I); 45 C.F.R. 1326.25(a) (1-3).
[7] *See* **Exhibit 7**.

41.     Therefore, the only relevant condition under which Defendant could validly claim access to records at Metro is the condition which requires Defendant to receive a complaint alleging abuse or neglect or when probable cause for abuse or neglect exists.

42.     Probable cause is defined as a "reasonable ground for belief that an individual with developmental disabilities has, or may be, subject to abuse [or] neglect."[8]

43.     Although the Defendant continues to assert a complaint has been received, CMBOE has not been provided with any details of said complaint or report that constitute probable cause of abuse or neglect outside of what is listed in Paragraph 13 and **Exhibit 6**.

44.     Even assuming the assistive technology devices were being used in the manner Defendant alleges, such use does not constitute abuse or neglect.

45.     Furthermore, if a student's IEP provides for use of an assistive technology device in a way that prevents harm to the student or aids in the student's convenience, such use would not constitute an inappropriate use of said device, and therefore would not, per Defendant's definition interpretation, rise to the level of abuse or neglect.

46.     CMBOE offered Defendant an opportunity to view IEPs which contained instructions specifically related to the use of assistive devices of ambulatory students, but Defendant refused to narrow its request and instead requested all redacted IEPs.[9]

47.     The redacted IEPs prevented Defendant from linking particular students—who were authorized by the IEP team to use assistive technology devices for their convenience or safety —to specific IEPs.

---

[8] 45 C.F.R 1326.19.
[9] *See* **Exhibit 2**.

48.     A complaint related to a limited number of students does not constitute probable cause for every student in a school.[10]

49.     While it "may be made based on reasonable inferences"[11], probable cause must be concrete and articulable.[12]

50.     While CMBOE does not agree that the provided information meets the definition of probable cause, as it relates to the observed students, CMBOE forcefully objects to such information being used to support Defendant's contention that it has reasonable grounds to believe that all students at Metro have been or may be subject to abuse/neglect.[13]

51.     While some jurisdictions have allowed Protection and Advocacy agencies access to the records of all students, these instances have been limited to circumstances where there has been serious injury or death or allegations of pervasive systematic abuses. [14]

52.     Such reasoning is lacking in this case and, therefore, probable cause for obtaining the records of every student at Metro school does not exist.

53.     Defendant claims, without controlling authority, it has the sole discretion to determine what information constitutes probable cause, that it does not have to disclose that information to anyone, and that there are no checks and balances on its determination.

54.     Due to the parties' failure to agree upon what constitutes reasonable probable cause and whether probable, as it relates to a finite number of students, permits Defendant to

---

[10] See *Wash. Prot. & Advocacy Sys. v. Evergreen Sch. Dist.*, Case No. C03-5062 FDB (W.D. Wash. 2003), (unpublished) *aff'd*, 71 Fed. Appx. 654, 2003 WL 21751827 (9th Cir. Wash), finding no abuse of discretion. *See* **Exhibit 8**
[11] 45 C.F.R. 1326.19.
[12] *See Pennsylvania Prot. & Advocacy, Inc. v. Royer-Greaves Sch. for Blind*, 1999 U.S. Dist. LEXIS 4609, at *26 (E.D. Pa. March 24, 1999). *See* **Exhibit 9**
[13] *See* **Exhibit 2.**
[14] *See Iowa Prot. & Adv. Servs., Inc. v. Gerard Treatment Programs*, LLC, 152 F. Supp. 2d 1150 (N. D. 2001); *Disability Ctr. of Alaska v. Anchorage Sch. Dist.*, 581 F.3d 936 (2009); *Conn. Office of Prot. & Advocacy v. Hartford Bd. Of Educ.*, 355 F. Supp. 2d. 649 (D. Conn. 2005).

obtain PII for every student at a school, CMBOE requests the Court clarify what determines the standard for probable cause when Protection and Advocacy agencies seek access to all students' PII, and whether, based on the standard provided by Defendant, CMBOE is required to release the requested information.

WHEREFORE, for all the reasons set forth above, CMBOE respectfully requests that the Court issue a finding that FERPA prohibits the release of the names of all the parents or guardians of the Metro students, that Defendant's overly broad requests lacks grounds on which to base a reasonable belief that "all students at Metro have or may be subject to abuse or neglect," and find that Defendant has not met its burden that there are reasonable grounds for obtaining parent/guardian information for all students at Metro. CMBOE further requests that the Court grant any other such relief as may be appropriate.

Respectfully submitted, this the 28th day of September, 2017.

s/ J. Melissa Woods
J. Melissa Woods
Senior Associate General Counsel
N.C. Bar Number: 21313
Email: jamiem.woods@cms.k12.nc.us

s/ Andre Mayes
Deputy General Counsel
N.C. Bar Number: 14102
Email: andre.mayes@cms.k12.nc.us
Attorneys for the Plaintiff
Charlotte-Mecklenburg Board of Education
600 E. Fourth Street, 5th Floor
Charlotte, North Carolina 28202
Phone: 980-343-6228; Facsimile: 980-343-5739

# INDEX FOR EXHIBITS IN COMPLAINT

Exhibit 1.    Letter dated June 7, 2017.

Exhibit 2.    Email dated June 23, 2017.

Exhibit 3.    Letter dated July 13, 2017.

Exhibit 4.    Letter dated August 3, 2017.

Exhibit 5.    Letter dated August 9, 2017.

Exhibit 6.    Letter dated August 14, 2017.

Exhibit 7.    Email dated June 16, 2017.

Exhibit 8.    *Washington Prot. and Advocacy Sys. Inc. v. Evergreen Sch. Dist.*, Case No. C03-5062 FDB (W.D. Wash. 2003), (unpublished) *aff'd*, 71 Fed. Appx. 654, 2003 WL 21751827 (9th Cir. Wash), finding no abuse of discretion.

Exhibit 9.    *Pennsylvania Prot. & Advocacy, Inc. v. Royer-Greaves Sch. for Blind*, 1999 U.S. Dist. LEXIS 4609, at *26 (E.D. Pa. March 24, 1999).



**DISABILITY RIGHTS**
NORTH CAROLINA
*Champions for Equality and Justice*

June 7, 2017

Principal Fermandi Dyson
Metro School
405 South Davidson Street
Charlotte, NC 28202

RECEIVED

JUN - 9 2017

OFFICE OF GENERAL COUNSEL

      Re: Complaint of Abuse and Neglect
         Sent via email (fermandis.dyson@cms.k12.nc.us) and U.S. mail

Dear Ms. Dyson,

Disability Rights NC is North Carolina's Protection and Advocacy system (P&A). Each state's P&A is part of a federally mandated system with the authority and obligation to protect and advocate for the human and legal rights of individuals with developmental and/or other disabilities.[1] More specifically, P&As have the obligation and authority to investigate incidents of abuse and neglect of individuals with developmental and/or other disabilities that are reported to the P&A, or if there is probable cause to believe that the incidents occurred.[2] The term "abuse" includes actions that cause psychological harm, physical injury, or death. Where a restraint is improperly utilized, it may be considered a form of abuse.[3] "Neglect" includes acts or omissions that cause injury or death. Failure to develop or carry out an appropriate individual education plan, or failure to provide health care, may be considered neglect.[4]

Disability Rights NC is required to conduct abuse and neglect investigations in all settings that serve people with developmental and/or other disabilities.[5] The school setting is one in which an abuse and neglect investigation may occur.[6] Thus, Disability Rights NC's protection and advocacy system responsibility and authority includes responding to complaints of abuse or neglect that occur within schools serving students with developmental and/or other disabilities.[7]

---

[1] *See* 29 U.S.C. § 794e (Protection and Advocacy of Individual Rights Program, (the PAIR Act)); 42 U.S.C. §§ 10801 *et seq.* (Protection and Advocacy for Individuals with Mental Illness Act (the PAIMI Act)); 42 U.S.C. §§ 15001 *et seq.* (Developmental Disabilities Assistance Bill of Rights Act (the DD Act)).

[2] 29 U.S.C. § 794e(f)(2); 42 U.S.C. § 10805(a)(1)(A); 42 U.S.C. § 15043(a)(2)(B); 42 C.F.R. § 51.2; 45 C.F.R. § 1326.25.

[3] 42 C.F.R. § 51.2; 45 C.F.R. § 1326.19.

[4] 42 U.S.C. § 10802(5); 45 C.F.R. § 1326.19.

[5] 42 U.S.C. § 10805(a)(3); 42 U.S.C. § 15043(a)(2)(H).

[6] *See Conn. Office of Prot. & Advocacy v. Hartford Bd. of Education*, 355 F. Supp. 2d 649 (D. Conn. 2005), *aff'd*, 464 F.3d 229 (2nd Cir. 2006) ("To the extent that developmentally disabled students attend HTLA, ... the school is undoubtedly a 'location in which services, supports, and other assistance are provided.' 42 U.S.C. § 15043(a)(2)(H) - (I).")

*North Carolina's Protection and Advocacy System*

3724 National Drive
Suite 100
Raleigh, NC 27612

919-856-2195

www.disabilityrightsnc.org



EXHIBIT
**1**

Disability Rights NC has received a complaint regarding improper use of restraint, including but not limited to wheelchairs and other assistive technology devices, at Metro School. Therefore, we are conducting an investigation into student care and treatment.

Disability Rights NC has broad authority to access records related to alleged abuse and/or neglect of persons with disabilities when:

1. The P&A has received a complaint or has probable cause to believe that abuse and/or neglect has occurred;
2. The individual has a legal guardian or other representative; and
3. The P&A has made a good faith effort to contact the representative upon receipt of the representative's name and address.[8]

The provision regarding contact with a legal representative "upon receipt of the name and address of such representative" has been interpreted to permit the P&A to obtain the names and addresses of the legal guardian of the individual about whom a complaint was received or for whom there is the requisite degree of probable cause to demand records.[9]

Pursuant to Disability Rights NC's federal statutory authority, we request copies of the following documents:

- Individual Education Plans (IEPs) for all students enrolled at Metro School **within fifteen business days of the date of this letter.** Specifically, Disability Rights NC requests that Metro School redact all identifying information and include only the portions of each IEP that describe the use of assistive technology, seclusion, and/ or restraint.

AND

- Copies of all forms, waivers, and other written or recorded parental permission given to the school to use wheelchairs or other devices in order to support or mitigate harm for a child with a physical or medical condition **within fifteen business days of the date of this letter.** Disability Rights NC requests that all identifying information be redacted.

In the alternative, pursuant to Disability Rights NC's federal statutory authority, we request the following:

---

[7] *See Conn. Office of Prot. & Advocacy*, 355 F. Supp. 2d at 659-60 (interpreting the PAIMI Act, DD Act and PAIR Act, along with the accompanying regulations, to extend P&A access authority to a non-residential public school setting). *See also Michigan P&A Service, Inc., v. Miller*, 849 F. Supp. 1202 (W.D. Mich. 1994) (finding that "facilities" covered by the PAIMI regulations include schools because special education provides care and/or treatment for people with mental illness, even if the services are considered only incidental to the primary function of the school); *and see* S. Rep. No. 106-196, at 26 (1999) (P&A authority is just as broad with respect to community settings so as to ensure people with disabilities are receiving the requisite care and services).

[8] 42 U.S.C. § 15043(a)(2)(I)(iii).

[9] *See Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649 (D. Conn. 2005), *aff'd*, 464 F.3d 299 (2nd Cir. 2006); *Disability Rights Wis., Inc. v. State Dep't of Pub. Instruction*, 463 F.3d 719 (7th Cir. Wis. 2006).

**EXHIBIT**

**1**

- The name and contact information of the legal guardian for each student enrolled at Metro School within three business days of the date of this letter so that Disability Rights NC may contact each to obtain an Authorization to Release Confidential Information in order to gain release of the non-redacted and complete records described above.

Thank you in advance for your cooperation in this matter. Please address the records, or the name and contact information of legal guardians, to my attention at the address listed above. If there is a fee for the actual cost of duplicating the requested records, please inform me of that cost prior to making the copies. You can also send the records electronically to kristine.sullivan@disabilityrightsnc.org. Should you have any questions or concerns, please do not hesitate to contact me at (919) 856-2195.

Kindest regards,

Kristine L. Sullivan
Attorney

cc: Courtney C. Rogers, CMS Attorney, via email (Courtneyc.rogers@cms.k12.nc.us)



EXHIBIT
1

**Woods, Jamie M.**

| | |
|---|---|
| **From:** | Kristine Sullivan <kristine.sullivan@disabilityrightsnc.org> |
| **Sent:** | Friday, June 23, 2017 3:59 PM |
| **To:** | Woods, Jamie M. |
| **Subject:** | Narrowing of our records request |

Hi Melissa,

I hope this email finds you well. After giving it a lot of consideration and speaking with some of my colleagues, I am not able to narrow down the records request any further for CMS. Listing out all of the information that we are looking for and any possible situation we would want to see records for would take an enormous amount of time, and would still require CMS to produce all of the IEPs ar Metro. Further, because we have determined that there is probable cause regarding all the students at Metro, we do need to see all of the IEPs.

We appreciate CMS's desire to work collaboratively and try to narrow down the request a little, but after mulling things over for the past few days, there is just no way that will be workable.

Thank you,
Kristine

Kristine L. Sullivan
Attorney
Disability Rights NC
(919) 856-2195

Sent from my phone; please excuse typos.



EXHIBIT
2

1



**cms**®

Charlotte-Mecklenburg Schools

*Every Child. Every Day. For a Better Tomorrow.*

Office of General Counsel

P.O. Box 30035
Charlotte, North Carolina 28230-0035

July 13, 2017

Kristine L. Sullivan, Esq.
Disability Rights North Carolina
3724 National Drive, Suite 100
Raleigh, NC 27612

Re:    Metro School

Dear Ms. Sullivan,

I am writing to inform you of the district's decision regarding Disability Rights of North Carolina's (DRNC) records request at Metro School. However, I would also like to summarize what led to this decision, and advise you how CMS will respond to similar demands from DRNC in the future.

When DRNC first sent a letter requesting documents, it clearly stated there had been a complaint[1] of abuse and neglect. Upon speaking with you, however, we learned there was no complaint. During that conversation, you also stated there was probable cause to obtain information on **all** students based on three reasons:  1) an ambulatory student being offered, and refusing, a wheelchair followed by a school administrator's explanation, to your inquiry, that offering such assistive devices were sometimes done for convenience; 2) a student being seated in a Rifton chair during class, followed by the same school administrator's response, again to your inquiry, that the chair was used to stabilize the student's movements during class time; and 3) the extensive number of assistive devices that you observed in the classrooms. I will address each in order.

As to the student offered the wheelchair, there are multiple reasons ambulatory students at Metro may require assistive technology devices (ATDs). If the student's IEP provides, or parents request it, an ATD can be made available. Without further information about this specific student—it appears no effort was made to identify the student during your visit—there is no way to provide documentation of such permission. As to the student in the Rifton chair, some Metro students require additional stabilizing support. This authorization would also be in the student's IEP. Those documents may have been accessible to DRNC if any attempt had been made to identify that student. Finally, regarding the number of ATDs in the classrooms, all of the approximately 250 students who attend Metro have a cognitive disability.  As explained on the

---

[1] 45 C.F.R. § 1326.19

Phone: 980-343-6228

**EXHIBIT**
**3**

■ www.cms.k12.nc.us

In compliance with federal law, Charlotte-M... ...cation programs, employment activities and admissions without discrimination against a... ...olor, religion, national origin, age or disability. Americans with Disabilities Act (ADA) Accessibility: if auxilia... ...ry for participation in a CMS program or service, participants are encouraged to notify the ADA coordinator at least on... ...t at 980-343-6661 (voice) or accessibility@cms.k12.nc.us.

school's website, "[m]any of [the students have severe medical and physical needs; many . . . are in need of total physical care and assistance; and many have other multiple disabilities . . . .[2]" Obviously, with this student population, there would be an extensive number of wheelchairs, Rifton chairs, and other ATDs in the classrooms at Metro. It seems incredulous that an agency which focuses on the rights of disabled individuals would be shocked to find numerous ATDs at a school that solely serves a disabled population.

These three reasons do not constitute a complaint. Nor do they, alone or combined, give rise to probable cause of abuse or neglect for all students at Metro School.

While we agree with your reading of the Protection and Advocacy (P&A) statutes allowing access to the records of Individuals with disabilities when certain circumstances have been met[3], you have interpreted the statutory authority too broadly by requesting the IEPS of all the Metro students. The law in this area is far from settled. Although you reference *Iowa Prot. & Advocacy Servs. v. Gerard Treatment Programs, L.L.C.*, that case is distinguishable from the facts here. Specifically, there was articulable probable cause based on the death of a resident, and the court determined there was potentially imminent danger to other residents.[4] Additionally, other jurisdictions have limited the authority of P&As when the alleged probable cause has no sound basis[5], or when P&As could not demonstrate that additional records were needed to complete an investigation.[6]

The district carefully deliberated its options. In addition to advice from Counsel, the district also considered the impact of the inflammatory, and wholly unfounded, language in your emails that referenced the potential abuse or neglect of **every student** at Metro. To mitigate potential disruption to the school environment, the district has decided to provide the redacted IEPs of the students and the consent forms, if they exist[7]. The documents will be mailed from the Exceptional Children Department today. The cost for copying those documents is $762.00 (10 cents a page for approximately 3,800 copies). We are also requesting reimbursement for the cost of shipping which is $200.00. Make the check payable to CMS Board of Education and include a notation for "EC Department."

Please understand this response is not a recognition of DRNC's overreaching authority. It is our position that you lack articulable probable cause in this matter. Also, please understand that future attempts to obtain such records without the requisite complaint or probable cause will be highly scrutinized. CMS will not hesitate to seek a resolution of these matters in the courts.

---

[2] *Metro School*, Charlotte-Mecklenburg Schs.,
http://schools.cms.k12.nc.us/metroEC/Pages/AboutOurSchool.aspx (last visited July 13, 2017).
[3] 42 U.S.C.S. § 10543 (a)(2)(H).
[4] *Iowa Prot. & Advocacy Servs. v. Gerard Treatment Programs, L.L.C.*, 152 F.Supp.2d 1150, 1169-70 (N.D. Ia. 2001).
[5] *Georgia Advocacy Office, Inc. v. Camp*, 172 F.3d 1294 (11th Cir. 1999).
[6] *Disability Rights N.Y. v. N. Colonie Bd. of Educ.*, 2016 U.S. Dist. LEXIS 36509 (N.D.N.Y. Mar. 21, 2016).
[7] Parents are not required to consent to all the information in an IEP.



EXHIBIT
3

Respectfully,

J. Melissa Woods
Senior Associate General Counsel


EXHIBIT

3

August 3, 2017

J. Melissa Woods
Senior Associate General Counsel
Charlotte-Mecklenburg Schools
P.O. Box 30035
Charlotte, NC 28230-0035

      Re: Metro School

Dear Ms. Woods,

I am writing in response to your letter of July 13, 2017, addressing the request for records
Disability Rights NC originally made of Charlotte-Mecklenburg Schools and the Metro School
on June 9, 2017. This letter also serves as a separate request for information.

As noted in your letter, the June 9 request stated Disability Rights NC had received a complaint
regarding abuse and/or neglect of students at the Metro School. Your letter then stated that after
speaking to me by telephone, you learned there was no complaint. This is incorrect. As I
explained in the June 9 request, and by telephone and subsequently by email on June 16,
Disability Rights NC received a complaint of alleged abuse and/or neglect. As the designated
Protection and Advocacy System (P&A) for North Carolina, Disability Rights NC is entitled to
access records of an individual when, among other situations, we have received a complaint that
abuse and/or neglect has occurred. A complaint "includes, but is not limited to, any report or
communication, whether formal or informal, written or oral, received by the P&A system,
including media accounts, newspaper articles, electronic communications, telephone calls
(including anonymous calls) from any source alleging abuse or neglect of an individual with a
developmental disability."[1] The report provided to Disability Rights NC constitutes a complaint
as defined in the federal P&A statutes and regulations; therefore, Disability Rights NC is entitled
to request records in order to investigate that complaint.

Your letter accurately indicated that, during the June 16 telephone call and in the subsequent
email of the same date, Disability Rights NC stated that we had determined there was probable
cause to believe that abuse and/or neglect had occurred. However, your letter mischaracterized
the stated basis for that decision. At this time, Disability Rights NC chooses to forego a detailed
recitation of the inaccuracies in your letter and the bases for our probable cause determination.
Instead, we reiterate that we have probable cause to believe that students at Metro School have
been, or may have been, subjected to abuse and/or neglect. For purposes of the P&A, probable
cause means

      a reasonable ground for the belief that an individual with
      developmental disability(ies) has been, or may be, subject to abuse

---

[1] 45 C.F.R. § 1326.19.

*North Carolina's Protection
and Advocacy System*

| 3724 National Drive | 919-856-2195 |
| Suite 100 | |
| Raleigh, NC 27612 | www.disabilityrightsnc.org |



EXHIBIT
4

or neglect, or that the health or safety of the individual is in serious and immediate jeopardy. The individual making such determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions, or problems that are usually associated with abuse or neglect.[2]

Disability Rights NC determined that probable cause exists in this matter based upon the information provided to us, our observations and experiences during monitoring and other visits to Metro School, and the experiences and training of our staff.

The remainder of your letter provided a comprehensive explanation for Charlotte-Mecklenburg Schools' determination that Disability Rights NC lacks probable cause to request records in this matter. The comments to the federal regulations make clear that the service provider (here, Charlotte-Mecklenburg Schools) does not determine whether the P&A has probable cause to believe abuse and/or neglect has or may have occurred. "Where there is controversy between the P&A and service provider [regarding grounds to request records], *the P&A makes the relevant determination*, in the interest of providing strong protection and advocacy for people with developmental disabilities in keeping with the purpose of the DD Act. In situations regarding abuse and neglect, the court remains 'the final arbiter' with respect to determining whether an adequate basis for probable cause exists."[3]

As Disability Rights NC has received a complaint regarding abuse and/or neglect at Metro School, and has determined that probable cause exists to believe abuse and/or neglect has occurred at Metro School, Disability Rights NC is investigating this matter. Disability Rights NC has broad authority to access records related to alleged abuse and/or neglect of persons with disabilities when:

1. The P&A has received a complaint or has probable cause to believe that abuse and/or neglect has occurred;
2. The individual has a legal guardian or other representative; and
3. The P&A has made a good faith effort to contact the representative upon receipt of the representative's name and address.[4]

The relevant regulations explicitly state that "[e]ducational agencies, including public... schools, must provide a P&A with the name and contact information for the parent or guardian of a student for whom the P&A has probable cause to obtain records under the DD Act."[5] This codifies court decisions interpreting the provision regarding contact with a legal representative "upon receipt of the name and address of such representative" to permit the P&A to obtain, from the service provider, the names and addresses of the legal guardian of the individual about whom

---

[2] *Id.*
[3] Developmental Disabilities Program, 80 Fed. Reg. 44,796, 44,800 (July 27, 2015) (emphasis added).
[4] 42 U.S.C. § 15043(a)(2)(I)(iii).
[5] 45 C.F.R. § 1325(f).


EXHIBIT
4

a complaint was received or for whom there is the requisite degree of probable cause to demand records.[6]

As Disability Rights NC has both a complaint and probable cause in this matter, we have the authority to obtain the name and address for the legal guardian or other representative of each student at Metro School. Therefore, we are requesting you provide us with that information. Please address the name and contact information of all students' legal guardians to my attention at the address listed above within three business days of the date of this letter.[7] You can also send the information electronically to kristine.sullivan@disabilityrightsnc.org.

Should Charlotte-Mecklenburg Schools decline to provide the requested information, Disability Rights NC is entitled to a written statement of the reason(s) for the denial within one business day of the expiration of the above deadline.[8] If the request for information is denied, Disability Rights NC will be forced to seek a court order resolving this matter.

Sincerely,

Kristine L. Sullivan

---

[6] *See Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649 (D. Conn. 2005), *aff'd*, 464 F.3d 299 (2nd Cir. 2006); *Disability Rights Wis., Inc. v. State Dep't of Pub. Instruction*, 463 F.3d 719 (7th Cir. Wis. 2006).
[7] *See* 42 U.S.C. § 15043(a)(2)(J)(ii).
[8] 45 C.F.R. § 1326.26.



EXHIBIT
4



Every Child. Every Day. For a Better Tomorrow.

August 9, 2017

Kristine Sullivan
Disability Rights of North Carolina
3724 National Drive, Suite 100
Raleigh, NC 27612

Dear Kristine:

This is a response to your letter dated August 3, 2017. As I informed you, via email, on Monday, August 7, our administrative offices were closed on Friday, August 4, so we officially received your letter on August 7, 2017. At this time, the district is denying the request by Disability Rights of North Carolina's (DRNC) for the name and contact information for the parents or guardians of all the students at Metro School.

Our intent is not to be adversarial. As I stated in our July 16th conversation, the district <u>wants</u> to address and rectify any concerns that potentially put students at risk. If there are valid safety concerns at Metro, CMS is willing to resolve those issues. We recognize that DRNC serves an important role in protecting the rights of children with disabilities. However, CMS also has an important duty to protect our students and their privacy.

Per the protection and advocacy statutes, probable cause is required, before any release of information can be considered[1]. We still have no idea what the probable cause is in this case. Since you stated that I inaccurately recounted our July 16th conversation, please inform us of the nature of the complaint that led to probable cause that all students at Metro are in danger of abuse or neglect. The district will then assess this information and can make an informed decision regarding your request.

At this time, however, it is the district's position that DRNC is not entitled to parent or guardian contact information due to the protections guaranteed to our students under FERPA[2], North Carolina privacy laws[3], and CMS board policies.[4] As the disclosure that DRNC seeks does not meet any exemption under those guidelines, we cannot release the information.

If you would like to discuss this further to determine if a mutual resolution can be reached, I am amenable to such a discussion. Please feel free to contact me at any time via phone (980-343-0874) or email (jamiem.woods@cms.k12.nc.us).

Sincerely,

J. Melissa Woods
Senior Associate General Counsel

---

[1] 45 C.F.R. 1326.19
[2] 20 U.S.C. §1232g (b)(1).
[3] N.C. Gen. Stat. §115C-174.13, §115C-402.
[4] CMS Board Policy JRA

**EXHIBIT 5**

In compliance with federal law, Charlotte-... ...ucation programs, employment activities and admissions without discrimination against a... ...color, religion, national origin, age or disability. Americans with Disabilities Act (ADA) Accessibility: If auxilia... ...ry for participation in a CMS program or service, participants are encouraged to notify the ADA coordinator at least on... ...t at 980-343-6661 (voice) or accessibility@cms.k12.nc.us.

August 14, 2017.



**DISABILITY RIGHTS**
NORTH CAROLINA
*Champions for Equality and Justice*

J. Melissa Woods
Senior Associate General Counsel
Charlotte-Mecklenburg Schools
P.O. Box 30035
Charlotte, NC 28230-0035

     Re: Metro School

Dear Ms. Woods,

Thank you for your letter date August 9, 2017. Disability Rights NC understands that at this time, Charlotte-Mecklenburg Schools (CMS) has declined to release the names and contact information for the parents or guardians of all students at Metro School. We understand the reason for this decision is that CMS does not know the basis for Disability Rights NC's determination that probable cause exists in this case. I appreciate your offer to discuss this matter further.

As I explained in my letter dated August 3, 2017, the Protection and Advocacy System (P&A) is entitled to receive, from the service provider in question, the name and contact information for the guardian or legal representative of each individual for whom the P&A has probable cause to believe that abuse and/or neglect has occurred. The P&A is the party that determines whether probable cause exists. This determination is sufficient to invoke the P&A's access authority; there is no accompanying requirement that the P&A divulge the basis for this determination. Additionally, the P&A is required to maintain the confidentiality of all records and information pertaining to "the identity of individual... who furnish information that forms the basis for a determination that probable cause exists" and those individuals who "provided information to the P&A for the record." 45 C.F.R. § 1326.28(b)(1)(iii-iv). Therefore, it is not Disability Rights NC's practice to provide service providers with the bases for its probable cause determinations. This letter is not intended to alter or undermine that practice.

However, as CMS has indicated a willingness to reconsider its position, Disability Rights NC will provide a limited summary of the information underlying our probable cause determination. During visits to Metro School, Disability Rights NC staff members observed students being transported throughout the school in wheelchairs. We learned that many of these students are capable of ambulating and do not require the use of a wheelchair. Instead, the wheelchairs were used for "safety" and the convenience of staff. Such use of a wheelchair is an inappropriate form of restraint. During these visits, Disability Rights NC staff members observed students sitting in Rifton chairs. We learned that for many of these students, the Rifton chairs do not serve as adaptive equipment or assistive technology. Instead, they are used to contain the students and "keep them still" during classroom instruction. Such use of a Rifton chair is an inappropriate form of restraint. Disability Rights NC received information indicating that these practices are fairly commonplace. Therefore, we determined that there is probable cause to believe students at

*North Carolina's Protection and Advocacy System*

3724 National Drive
Suite 100
Raleigh, NC 27612

919-856-2195



**EXHIBIT**
**6**

www.disabilityrightsnc.org

Metro School have been subjected to the use of inappropriate restraint, and thus to abuse and/or neglect.

I look forward to hearing from you by close of business on Wednesday, August 16, 2017. Disability Rights NC hopes we can resolve this matter by then, but is prepared to proceed as necessary at that time.

Thank you,

Kristine L. Sullivan



EXHIBIT
6

| | |
|---|---|
| **From:** | Kristine Sullivan <kristine.sullivan@disabilityrightsnc.org> |
| **Sent:** | Friday, June 16, 2017 5:04 PM |
| **To:** | Woods, Jamie M. |
| **Cc:** | Joonu-Noel Coste |
| **Subject:** | Authority to access records |

Melissa,

Thank you for speaking with me this afternoon regarding Disability Rights NC's request for records from the Metro School. As you requested, I am sending additional information that explains the legal authority for the breadth of our request.

Please note that I am only referencing the DD Act here (and the PAIR Act, as it simply states that the Protection and Advocacy System (P&A) has the same authority under PAIR as under the DD Act) just for simplicity, and because, as I stated on the phone, I believe these are the two Acts most relevant to the children at Metro. To the extent that the any student has a mental illness and would be covered under the PAIMI Act, the relevant provisions of the PAIMI Act are the same as the DD Act.

As you know no doubt know from your own research into the P&A statutes, Disability Rights NC is entitled to access records of an individual in a number of situations, including (1) where we have a client, and the client or guardian has authorized us to access his/her records; (2) where an individual cannot authorize access, he/she has no guardian or has a State (e.g. DSS) guardian, and we have received a complaint or determined there is probable cause to believe abuse/neglect has occurred; or (3) where we have received a complaint or determined probable cause exists, we have made a good faith effort to contact the guardian upon receiving the guardian's name and contact information, and the guardian has failed or refused to provide consent on behalf of the individual. 45 C.F.R. 1326.25(a). We acknowledge that (1) is not applicable, as we have no client in this matter. Our request therefore relies on (2) and (3).

For some of the students, Disability Rights NC has received a complaint of alleged abuse or neglect, and seeks the requested records based upon such a complaint. A complaint includes any communication or report, whether formal or informal, alleging abuse or neglect of an individual with a developmental disability. 1326.19. I shared the basis for this complaint during our telephone conversation. For the remainder of the students (and to answer your question from earlier more thoroughly and explicitly), Disability Rights NC has determined that there is probable cause to believe that the students may have been, or may be, subjected to abuse/neglect. Based on the information provided to Disability Rights NC and our observations during the monitoring visit (including the extensive number of wheelchairs, Rifton chairs, and other devices present in Metro's classrooms that constitute a restraint), Disability Rights NC finds there is a reasonable ground to believe that all of the other students at Metro have been or may be subject to abuse/neglect. Therefore, Disability Rights NC is entitled to obtain the requested records for all students at Metro, and is not required to narrow the group further.

Unfortunately there are no controlling cases in North Carolina on this point. There is an illustrative case from Iowa. In *Iowa Prot. & Advocacy Servs. v. Gerard Treatment Programs, L.L.C.*, 152 F. Supp. 2d 1150 (N.D. Iowa 2001), the U.S. District Court for the Northern District of Iowa held that the Iowa P&A had the authority to access all records of individuals in the Gerard Treatment Programs. The Court referenced a similar case from Pennsylvania, *Penn. Prot. & Advocacy, Inc. v. Royer-Greaves Sch. For Blind*, 1999 U.S. Dist. LEXIS 4609, 1999 WL 179797 (E.D. Pa. 1999). In *Royer-Greaves*, the Court denied the Pennsylvania P&A access to all of the records it sought, finding that the P&A had not presented any evidence that it received a complaint regarding an individual or that it had made a probable cause determination. In a footnote, the court noted

1

EXHIBIT
7

This ruling today should not be read to hold that there are no circumstances under which a P&A could have a more generalized access to records. For example, the Court can envision

a situation where a P&A receives complaints of serious widespread abuse against numerous residents, or has probable cause to suspect that the health and safety of numerous

residents is in serious and immediate jeopardy. Should such a situation present itself, it could warrant a P&A to have more generalized access to all of the records to properly

investigate.

*Royer-Greaves* at *27, n.11.

The *Gerard* court distinguished the circumstances before it from those in *Royer-Greaves*. It noted that the P&A had alleged it received information sufficient to make a probable cause determination and thus fell within the "exceptional circumstances contemplated in footnote 11." *Gerard* at 1172. The Court further stated that while the P&A had not expressly stated the precise nature of the threat to all residents, it appeared to be an alleged general misuse of restraints. *Id.* These allegations were sufficient to establish likelihood on the merits, and to support the preliminary injunction sought by the P&A. It is Disability Rights NC's position that it has sufficiently stated a basis for access to the records of all students at the Metro School.

I look forward to discussing this with you further.

Thank you,
Kristine

Kristine L. Sullivan
Senior Attorney
Disability Rights NC
3724 National Drive, Suite 100
Raleigh, NC 27612
Phone: 919-856-2195
TTY: 1-888-268-5535
Fax: 919-856-2244
kristine.sullivan@disabilityrightsnc.org
http://www.disabilityrightsnc.org

*Disability Rights NC participates in the State Employees Combined Campaign. Our SECC # is 1544.*

This transmission is intended for the sole use of the individual or entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or duplication of this transmission by someone other than the intended addressee or its designated agent is prohibited. If your receipt of this transmission is in error, please notify us by telephone (919) 856-2195 or return e-mail to the sender. Please delete all copies of this message and any attachments.



FILED ___ LODGED
___ RECEIVED

APR 1 1 2003

CLERK U S DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____DEPUTY

ENTERED
ON DOCKET

APR 1 4 2003

BY DEPUTY _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WASHINGTON PROTECTION AND
ADVOCACY SYSTEM, INC , a Washington
non-profit corporation,

        Plaintiff,

        v

EVERGREEN SCHOOL DISTRICT and
RICHARD MELCHING, in his official
capacity as the Superintendent for the
Evergreen School District,

        Defendants

Case No  C03-5062 FDB

ORDER DENYING PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION

Plaintiff Washington Protection and Advocacy System, Inc  ("WPAS") seeks a preliminary

injunction to obtain the names of all students with disabilities participating in the Evergreen School

District's ("the District") Work Experience Program ("WEP" or "Program") and contact

information for their parents and/or guardians.  The District and Richard Melching, Superintendent

for the District,  refuse to release the requested information and oppose WPAS's Motion for

Preliminary Injunction now before the Court   The Court has carefully reviewed the pleadings and

documents filed in this matter and finds that WPAS's Motion for Preliminary Injunction should be

**DENIED**

ORDER - 1

EXHIBIT
8

CV 03-05062 »00000025

1

## BACKGROUND

2       This case was prompted by complaints WPAS received from Mr Finders, a parent of a

3   student with disabilities enrolled in the District   WPAS is a protection and advocacy system ("P&A

4   system") designated by the Governor of the State of Washington under RCW 71A 10 080 to

5   implement a program for the protection and advocacy of the rights of persons with developmental

6   disabilities pursuant to the Developmentally Disabled Assistance and Bill of Rights ("DD") Act, 42

7   U S C § 15041 *et seq*, the Protection and Advocacy for Individuals with Mental Illness ("PAIMI")

8   Act, 42 U S C § 10801, *et seq*, the Protection and Advocacy for Individuals with Traumatic Brain

9   Injury ("PATBI") Act, the Protection and Advocacy for Individual Rights ("PAIR") Act

10  (hereinafter "the P&A Acts")

11      Mr Finders complained that his child along with other students with disabilities at Heritage

12  High School ("Heritage") were required by the District to collect garbage and recycling, as well as

13  lunchroom tables and chairs after school lunches as part of the school's WEP [1]   In addition, N F ,

14  Mr Finder's child, reported that a Heritage teacher required students with disabilities to collect

15  recyclable trash on a daily basis and cash in the recycling at a local store   The teacher allegedly

16  saved and used the collected funds for field trips

17      Acting on these complaints, WPAS sent Heritage's Special Service Department a probable

18  cause letter on December 6, 2002 requesting right of access to names, addresses, and phone

19  numbers of all students and their parents or guardians who participate in both the special education

20  program and the WEP   WPAS specifically stated in its December 6, 2002, letter that its probable

21  cause authority ("P&A authority") allows P&A's to investigate incidents of *abuse and neglect* of

22  individuals with disabilities if the incidents are reported to the system and there is probable cause to

23

24      [1]The record reveals that approximately 125 high school students in the District participate in the WEP   WEP participants qualify for "individualized educational programs"under the IDEA and receive academic credit for their participation   Participation in the WEP is voluntary and requires parental permission

25

26  ORDER - 2

EXHIBIT 8

1   believe that the incidents occurred  *See* Decl of Tara Herival, Exh 3A

2       The District, through its attorney, denied WPAS request claiming that WPAS lacked the

3   authority to obtain the information without parental consent  The District maintains this position

4   here and argues that release of the requested information would violate Family Educational Rights

5   and Privacy Act ("FERPA"), 20 U S C § 1232g *et seq*  and the Individuals with Disabilities

6   Education Act ("IDEA"), 20 U S C §§ 1400 *et seq*  The District further argues that the WPAS does

7   not have probable cause to believe that students in the District are being abused and neglected

8       WPAS argues in its memoranda supporting its Motion for Preliminary Injunction that it has

9   a statutory right of access under the aforementioned P&A Acts  WPAS does not agree that FERPA

10  and the IDEA trump its P&A authority  WPAS also argues that Mr Finder's complaint is sufficient

11  to establish probable cause that disabled students in the District are being abused and neglected and

12  that the District is violating its constitutionally protected rights to freedom of speech and

13  association under the First Amendment to the United States Constitution

14      Resolution of this matter requires a determination as to whether WPAS has met the standard

15  for a preliminary injunction

16                    **STANDARD FOR PRELIMINARY INJUNCTION**

17      To obtain a preliminary injunction, WPAS bears the burden of showing either  (1) a

18  combination of probable success on the merits and the possibility of irreparable injury, or (2)

19  serious questions as to these matters and the balance of hardships tips sharply in its favor

20  *Stuhlbarg v Int'l Sales Co Inc v John D Brush & Co* , 240 F 3d 832, 839-840 (9th Cir. 2001)

21  These two tests represent "a continuum of equitable discretion whereby the greater the relative

22  hardship to the moving party, the less probability of success must be shown "  *See Regents of Univ*

23  *of Calif v ABC, Inc* , 747 F 2d 511, 515 (9th Cir 1984)

24      Injunctions are classified as either "mandatory" (those commanding performance of acts on

25  the part of defendants) or "prohibitory" (those prohibiting acts on the part of defendants). *See*

26  ORDER - 3



1  *Meghrig v KFC Western, Inc*, 516 U S 479, 484-485 (1996)   Although the factors for

2  consideration of mandatory and prohibitory injunctions are the same, mandatory injunctions are

3  subject to a higher scrutiny   *See Dahl v HEM Pharmaceuticals Corp*, 7 F 3d 1399, 1403 (9th Cir

4  1993)

5       Mandatory preliminary injunctions go "well beyond simply maintaining the status quo" and

6  are particularly disfavored   *See Stanley v University of Southern California*, 13 F 3d 1313, 1320

7  (9th Cir. 1994)   As such, mandatory preliminary relief should be denied unless the facts and law

8  clearly favor the moving party   *Id*

9       Because WPAS seeks to require the District to go beyond the status quo and release

10  otherwise private information, the Court construes WPAS's request for preliminary relief as a

11  motion for mandatory preliminary injunction   Thus, the Court, applying the heightened standard,

12  will only issue WPAS's requested injunction if the law and the facts weigh heavily in WPAS's

13  favor

14                              **DISCUSSION**

15  **1.    Likelihood of Success On the Merits**

16       The primary issue before the Court is whether WPAS has sufficiently demonstrated a

17  likelihood of success on the merits   To establish a likelihood of success here, WPAS must show

18  that the facts and the law clearly support access to the District's records   A careful review of the

19  record reveals that WPAS has not satisfied its burden for purposes of this motion

20       First, the Court is not sufficiently satisfied that the P&A Acts override the FERPA and

21  IDEA   *Michigan P & A Serv, Inc v Miller*, 849 F. Supp 1202 (W D Mich 1994), the only case

22  cited by WPAS for this proposition, is not persuasive   The *Michigan P & A Serv* court, faced with

23  a motion for summary judgment, addressed whether the P&A service was being denied reasonable

24  access to *individuals*   *See Id* at 1205   The court did not address the issue we face here   whether the

25  P&A service had the authority to gain access to parent/guardian contact information for previously

26  ORDER - 4



1    unidentified students with disabilities participating in a WEP   In the absence of persuasive

2    authority on this particular issue, the Court is not inclined to disrupt the status quo and grant

3    WPAS's request   The District's citation to Developmental Disabilities Program, 61 Fed Reg

4    51,147 (1996) (codified at 45 C F R  1385) supports this conclusion

5           Moreover, the Court does not agree that the two bodies of law can be "harmonized" as the

6    type of information sought cannot properly be characterized as "directory information." Directory

7    information, a term WPAS concedes is defined only under FERPA, clearly does not include contact

8    information for parents/guardians or information sufficient to establish which students are

9    participating in the WEP   See 20 U S C  § 1232g(a)(5)(A)

10          Second, even if the Court could find that the P&A Acts give WPAS the authority to access

11   the requested information, WPAS still must establish a likelihood of success on its argument that it

12   has probable cause to believe that the District is abusing and neglecting N F  and other students

13   with disabilities participating in the WEP

14          Under the DD Act, P&A systems have the authority to investigate incidents of abuse and

15   neglect of individuals with developmental disabilities if the incidents are reported to the system or

16   if there is probable cause to believe that such individual has been subject to abuse or neglect   42

17   U S C  15043(B)   Probable cause under the DD and PAIMI Acts is "a reasonable belief that an

18   individual with mental illness has been, or may be at significant risk or being subject to abuse or

19   neglect " 42 C F R  § 51 2, 42 C F R  § 1386.19

20          Having reviewed the facts of this case carefully, the Court does not find that the allegations

21   are sufficient to establish probable cause that N F  has suffered abuse and neglect   Even assuming

22   WPAS's allegations to be true, the Court simply finds that collecting and recycling garbage does

23   not present a serious risk or potential for injury as contemplated by the P&A Acts   Furthermore,

24   WPAS's argument that it is the "sole and final arbiter of whether probable cause exists" is

25

26   ORDER - 5

EXHIBIT
8

1  unpersuasive  Plaintiff's Motion for Preliminary Injunction at 11   WPAS cites no case law

2  establishing that its probable cause determinations cannot be reviewed by this Court

3     WPAS further argues that the allegations here are sufficient to require the District to release

4  contact information for *all* disabled student participating in the WEP in the District   Probable cause

5  for generalized access to records has been established in a handful of cases   For instance, in *Iowa*

6  *Protection and Advocacy Services v  Gerard Treatment Programs*, 152 F  Supp  2d 1150 (N D

7  Iowa 2001) the court permitted the Protection and Advocacy organization to access patients records

8  at a psychiatric medical institution after a patient died from the misuse of restraints   The *Girard*

9  court found that broad access was necessary to determine whether patient abuse and neglect was

10  occurring in the institution

11     The facts of this case are not so compelling   The Court has already established that there is

12  an insufficient showing of abuse and neglect to grant WPAS access to N F 's records   Even if this

13  Court was satisfied that there is probable cause that N F, is suffered abuse and neglect, the evidence

14  is insufficient to establish that *all* disabled students in the District are required to participate in the

15  activities complained of   Complaints from one parent at one school in the District are insufficient

16  to establish probable cause to believe that disabled students throughout the District are being abused

17  and neglected   As such, the Court is not inclined to grant WPAS "broad access" to the requested

18  records.

19     Finally, the Court is not satisfied that a likelihood of success has been established on

20  WPAS's First Amendment claim   Again, the cases cited by WPAS concern access to individuals,

21  not school records identifying students with disabilities participating in the WEP   Thus, a

22  preliminary injunction will not be issued for this reason

23  **2.   Irreparable Injury**

24     WPAS argues that the students with disabilities in the District will suffer irreparable harm if

25

26  ORDER - 6



1   preliminary relief is not granted   For support, WPAS relies on *Cheema v  Thompson*, 67 F 3d 883,

2   885 (9th Cir  1995), *overruled on other grounds by City of Boerne v  Flores*, 521 U S  507 (1997)

3   The Court, however, is not persuaded by *Cheema*

4    *Cheema* is a school safety case that concerns the interests of three Sikh students whose

5   religious beliefs required them to carry ceremonial knives at all times   *See Id*   The students sought

6   a preliminary injunction against the enforcement of a school weapons ban   *See Id*   Besides being

7   factually dissimilar, *Cheema* stands for the proposition that denial of an educational opportunity

8   amounts to irreparable injury   The issue here is not whether the students with disabilities

9   participating in the WEP will suffer irreparable injury but whether WPAS will suffer irreparable

10  injury by the District's actions

11   The District argues that irreparable injury cannot be established because the WPAS, Mr

12  Finders, and any other parent of special education students at Heritage have available an adequate

13  legal remedy, other than injunctive relief, under the IDEA and Title II of the Americans with

14  Disabilities ("ADA") Act, 42 U S C  §§ 12141 *et seq*   The District points out that remedies under

15  these statutes would preserve privacy interests in educational records   While these remedies are

16  available to Mr  Finders, and other similarly situated parents, the Court is not persuaded that they

17  are available to the WPAS   Nonetheless, WPAS has failed to establish, for purposes of this motion,

18  that it will be irreparably injured if its request is not granted

19   Furthermore, the Court recognizes that the deprivation of First Amendment freedoms, for

20  even minimal periods of time, can constitute irreparable injury for preliminary injunction purposes

21  *See Elrode v  Burns*, 427 U S  347, (1976)   However, given the tenuous nature of WPAS's First

22  Amendment claim, the Court is unwilling to disrupt the status quo and order the District to release

23  the contact information

24  **3. Balance of Hardships**

25   When examining the balance of hardships, the Court must weigh carefully the relative

26  ORDER - 7


EXHIBIT
8

1  hardships to the parties  The greater the relative hardship to the moving party, the less strong need

2  be the showing of probable success that is required  *Beltran v  Myers*, 677 F 2d 1317, 1320 (9th Cir

3  1982)  The Court is not convinced that the equities tip sharply in WPAS's favor  Rather, the Court

4  finds that the balance of interests favors preservation of the status quo and the right to privacy in

5  educational records

6  ## CONCLUSION

7  WPAS has failed to show that the facts and the law weigh so heavily in its favor that

8  disruption of the status quo and of issuance of a mandatory preliminary injunction is warranted

9  Having failed to meet its burden, the Court has no choice but to deny WPAS's request for a

10  preliminary injunction requiring the District to release the names of all students with disabilities

participating in the District's WEP and contact information for their parents and/or guardians

11  ACCORDINGLY

12  IT IS SO ORDERED

13  (1)    Plaintiff's Motion for a Preliminary Injunction (Dkt  #2) is **DENIED**, and

14  (2)    The Clerk of the Court is directed to send copies of this Order to counsel for Plaintiff

15  and Defendants

16  DATED this  / /  day of April, 2003

17

18  FRANKLIN D  BURGESS
   UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26  ORDER - 8



car

United States District Court
for the
Western District of Washington
April 14, 2003


* * MAILING CERTIFICATE OF CLERK * *


Re:  3:03-cv-05062


True and correct copies of the attached were mailed by the clerk to the following


        Tara J Herivel, Esq.
        WASHINGTON PROTECTION & ADVOCACY SYSTEM
        STE 102
        180 W DAYTON
        EDMONDS, WA  98020

        David B Girard, Esq.
        WASHINGTON PROTECTION & ADVOCACY SYSTEM
        STE 102
        180 W DAYTON
        EDMONDS, WA  98020
        FAX 425-776-0601

        Lawrence B  Ransom, Esq.
        KARR TUTTLE CAMPBELL
        STE 2900
        1201 THIRD AVE
        SEATTLE, WA  98101-3028
        FAX 682-7100

        Tracy M Miller, Esq
        KARR TUTTLE CAMPBELL
        STE 2900
        1201 THIRD AVE
        SEATTLE, WA  98101-3028
        FAX 682-7100

        Judge Burgess



EXHIBIT
8

# *Pennsylvania Protection & Advocacy, Inc. v. Royer-Greaves Sch. for Blind*

United States District Court for the Eastern District of Pennsylvania

March 24, 1999, Decided ; March 25, 1999, Filed

CIVIL ACTION NO. 98-3995

**Reporter**
1999 U.S. Dist. LEXIS 4609 *; 1999 WL 179797

PENNSYLVANIA PROTECTION & ADVOCACY, INC., Plaintiff, v. ROYER-GREAVES SCHOOL FOR BLIND, et al., Defendants.

**Disposition:** [*1] Plaintiff's Motion for Summary Judgment DENIED in part and GRANTED in part. JUDGMENT entered in favor of the plaintiff to the extent that plaintiff seeks access to Royer Greaves during normal working and visiting hours without prior notice or appointment, and to the extent plaintiff requests a list of the legal guardian of the Royer Greaves residents and students. JUDGMENT entered in favor of the defendants to the extent plaintiff required to make an appointment twenty-four (24) hours in advance of meeting with individual students and/or residents, and to the extent plaintiff sought access to the records of the Royer Greaves students and/or residents.

## Core Terms

records, residents, probable cause, regulation, developmental disability, guardian, individuals, appointment, advocacy, neglect, jeopardy, services, complaints, name and address, legal guardian, summary judgment, facilities, restrictions, rights, authorization, conditions, patients, argues, notice, reasonable time, district court, recipients, monitor, health and safety, visiting hours

## Case Summary

### Procedural Posture

Plaintiff, a state protection and advocacy group, filed a motion for summary judgment in a cause of action against defendant, a school for the blind, alleging that defendant violated the Developmental Disabilities Assistance and *Bill of Rights* Act, *42 U.S.C.S. § 6000 et seq.*, by denying access to defendant's facility, to its

residents, and to its student records and/or to the names of residents' guardians.

### Overview

Defendant, a school for the blind, argued that access rights granted to plaintiff, a state protection and advocacy group, under the Developmental Disabilities Assistance and *Bill of Rights* Act (Act), *42 U.S.C.S.§ 6000 et seq.*, extended only to monitoring the safety of persons receiving advocacy services. The court disagreed, pointing to express language in the Act that extended plaintiff's reach to all residents of facilities providing services to the developmentally disabled. As to time and place restrictions to be imposed on plaintiff, the court ruled that normal hours facility access could be without notice, as monitoring of conditions could be hindered if notice required, but resident access required 24 hour notice, so as to not disrupt normal activities or increase student stress. In construing the Act's records access provision, the court stated that plaintiff was not entitled to all student records, but only to individual records based on specific complaints or probable cause. Yet, absent any entitlement to these records, plaintiff could obtain, upon request, a list of legal guardians, so as to advocate for students long before they were in jeopardy, the court concluded.

### Outcome

Summary judgment motion by plaintiff, a state protection and advocacy group, granted to the extent that facility access to defendant, a school for the blind, was limited to normal working hours, denied to the extent that student access was without prior notice or appointment and to the extent that plaintiff sought access to student records not prompted by individual complaints, but granted as to plaintiff's request for list of legal guardians.

## LexisNexis® Headnotes


EXHIBIT
9
tabbies®

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN1*[⬇] **Summary Judgment, Motions for Summary Judgment**

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. The evidence presented must be viewed in the light most favorable to the non-moving party. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other. In deciding the motion for summary judgment, it is not the function of the court to decide disputed questions of fact, but only to determine whether genuine issues of fact exist.

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN2*[⬇] **Discovery, Methods of Discovery**

The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings and designate specific facts, by use of affidavits, depositions, admissions, or answers to interrogatories, showing that there is a genuine issue for trial. Moreover, when the nonmoving party bears the burden of proof, it must make a showing sufficient to establish the existence of every element essential to that party's case. Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

Public Health & Welfare Law > Healthcare > Services for Disabled & Elderly Persons > General Overview

*HN3*[⬇] **Social Services, Institutionalized Individuals**

See *42 U.S.C.S. § 6042(a)(2)(H)*.

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

Public Health & Welfare Law > Healthcare > Services for Disabled & Elderly Persons > General Overview

*HN4*[⬇] **Social Services, Institutionalized Individuals**

See *45 C.F.R. § 1386.22(g)*.

Public Health & Welfare
w > Healthcare > Services for Disabled & Elderly

**EXHIBIT**

**9**

Persons > General Overview

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

HN5[⬇] Healthcare, Services for Disabled & Elderly Persons

Reasonable access includes general facility access without notice, and patient access with 24 hour notice.

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

Public Health & Welfare Law > Healthcare > Services for Disabled & Elderly Persons > General Overview

HN6[⬇] Social Services, Institutionalized Individuals

See 42 U.S.C.S. § 6042(a)(2)-(I).

Public Health & Welfare Law > Healthcare > Services for Disabled & Elderly Persons > General Overview

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

HN7[⬇] Healthcare, Services for Disabled & Elderly Persons

See 45 C.F.R. § 1386.22(I).

Public Health & Welfare Law > Healthcare > Services for Disabled & Elderly Persons > General Overview

Public Health & Welfare Law > Social Services > Institutionalized Individuals > General Overview

HN8[⬇] Healthcare, Services for Disabled & Elderly Persons

See 42 U.S.C.S. § 6042(a)(2)-I(iii).

**Counsel:** For PENNSYLVANIA PROTECTION & ADVOCACY, INC., PLAINTIFF: ILENE W. SHANE, DISABILITIES LAW PROJECT, PHILA, PA USA.

For PENNSYLVANIA PROTECTION & ADVOCACY, INC., PLAINTIFF: STEPHEN R. SULENTIC, DISABILITIES LAW PROJECT, PITTSBURGH, PA USA.

For ROYER-GREAVES SCHOOL FOR BLIND, DEFENDANT: JANE LANDES FOSTER, WILLIAM E. MAHONEY, JR., STRADLEY, RONON, STEVENS & YOUNG, PHILADELPHIA, PA USA.

For CAROL T. DALE, DEFENDANT: JANE LANDES FOSTER, STRADLEY, RONON, STEVENS & YOUNG, PHILADELPHIA, PA USA.

**Judges:** Clarence C. Newcomer, [*2] J.

**Opinion by:** Clarence C. Newcomer

# Opinion

## MEMORANDUM

Presently before the Court is Plaintiff's Motion for Summary Judgment and Defendant's response thereto. For the reasons that follow, said Motion will be granted in part and denied in part.

### I. BACKGROUND

The plaintiff, Pennsylvania Protection and Advocacy Inc. ("PP&A"), is a non-profit Pennsylvania corporation that has been designated by the Commonwealth as the protection and advocacy system for the state. The PP&A is established as part of the federal protection and advocacy system under the Developmental Disabilities Assistance and Bill of Rights ("DD") Act, 42 U.S.C. §§ 6000 et seq., and its sister statute. [1] As articulated by the Eleventh Circuit in Ala. Disab. Adv. v. J.S. Tarwater Develop. Center, 97 F.3d 492 (11th Cir.

_____

[1] 42 U.S.C. §§ 10801 et seq., which is modeled after the DD Act and provides parallel protections for individuals with mental illness.

EXHIBIT 9

*1996)*, the DD Act was passed after inhumane and despicable conditions were discovered at New York's Willowbrook State School for persons with developmental disabilities. *Id. at 494.* The purpose of the DD Act is to protect the human and civil rights of the vulnerable developmentally disabled. *Id.* Pursuant to the Act, a state cannot receive federal funds for services to said [*3] persons unless it has established a protection and advocacy system. Protection and advocacy systems are empowered to, among other things, "(1) investigate incidents of abuse and neglect of persons with developmental disabilities; (2) pursue legal, administrative, and other appropriate remedies on behalf of such persons to ensure the enforcement of their constitutional and statutory rights; and (3) provide information and referrals relating to programs and services addressing the needs of these persons." *Id. at 494-495.*

The defendants are Royer-Greaves School for the Blind ("RG"), and Carol T. Dale, sued in her individual capacity as executive director of the school. [2] RG is a non-profit entity that provides special education to multi-handicapped, mentally challenged blind students. The school has approximately 20 residents. It is not disputed that the school is subject [*4] to the DD Act. According to the affidavit of defendant Carol T. Dale, the school is subject to licensure and oversight of several state and local agencies, and has never had its license revoked, suspended or impaired.

The instant dispute traces its roots back to October of 1997. In early October, 1997, PP&A called Dale to make an appointment to visit the school. PP&A alleges that it initiated the call after receiving complaints from several sources concerning activities that it perceived as systemic neglect, as well as after identifying deficiencies in state Office of Mental Retardation ("OMR") reports also perceived by PP&A to constitute systemic neglect. According to RG, at the time of the visit, PP&A did not refer to any alleged complaints or incidents of neglect or abuse, and PP&A does not contend they so informed RG. Further, the only evidence of these alleged complaints submitted to the Court in support is the affidavit of Patricia Madigan, [*5] a PP&A employee, who said she "became aware of several complaints about RG from several people," and that "these complaints raised issues involving systemic 'neglect' as I understand and work with that concept under the DD Act." (Pl. Ex. 1, P 4). She also reviewed the OMR

reports, but does not specify what she believed constituted systemic neglect, nor has PP&A provided these reports.

On October 13, 1997, the appointed visit took place. According to Madigan's affidavit, other PP&A representatives [3] witnessed several incidents where the health and safety of the residents appeared to be in "serious potential jeopardy," including tripping hazards, a desk cluttered with a pack of cigarettes and an unidentified bottle of (maybe) prescription drugs, and open bottles of cleaning solutions on the sink in a classroom used for the younger students. A copy of the report has not been provided, nor has an affidavit from people who actually conducted the inspection.

According [*6] to Madigan, after this initial visit, she requested additional reports from OMR and planned a follow-up visit to RG. Madigan asserts that the OMR inspections [4] contained reports of inaccurate abuse reporting to the RG Board of Directors, lack of personal privacy during self-care, failure to complete individualized program plans for each individual in a timely manner upon admission, and staffing issues such as incomplete child abuse background checks and lack of physical exams. (Pl. Ex. 1, P 7.) She further states that she was provided by OMR a summary of the six unusual incident reports filed by RG in 1997, which include a death by asphyxiation, three hospital emergency room treatments, and a self-injury among the residents of RG. Regarding the unusual incident reports, defendant Dale in her affidavit states that the Department of Public Welfare's Mortality and Morbidity Committee conducted an investigation and found no fault on the part of the school, nor has the school been found to be at fault in connection with any unusual incident report that it has filed (Dale Affid. P 28).

[*7] Based on the above information, Madigan and another PP&A representative made an unannounced site visit to RG on Jan 28, 1998. Although she noticed some corrections, Madigan also witnessed circumstances that she claims raised the potential for serious health and safety problems. She saw a medication cart left unattended with the keys on top, and she felt that the staff at the swimming pool was not paying adequate attention to residents and/or was short-handed.

On March 6, 1998, and again on May 27, 1998, PP&A

[2] For simplicity, the Court will often refer to the defendants as RG.

[3] The affiant was not present at the inspection.

...gain, these reports have not been provided.

EXHIBIT 9

attempted two more unannounced site visits, including access to the residents, the facilities, and their records. RG refused these requests. With regard to unannounced site visits, RG insisted on PP&A making an appointment first. On July 31, 1998, PP&A commenced the present action.

In the instant Motion, PP&A moves for summary judgement, claiming that the basic facts are not in dispute, and they are entitled to a judgment as a matter of law on its claim that the defendants have violated the DD Act by: (1)denying PP&A access to the facility; (2) denying PP&A access to individuals residing within the facility; and (3) denying PP&A the opportunity to review and obtain copies of [*8] the records of the students and/or failing to provide PP&A with the name and address of the legal guardian of each resident of the facility. PP&A seeks an Order by this Court granting them unlimited access to RG during working and visiting hours without prior notice or appointment, and a complete list of the names of the legal guardians so PP&A may contact them concerning access to records.

## II. *SUMMARY JUDGEMENT STANDARD*

*HN1*[⬆] A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. *White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988)*. The evidence presented must be viewed in the light most favorable to the non-moving party. *Id.* "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. [5] In deciding the motion for summary judgment, it is not the function of the Court to decide disputed questions of fact, but only [*9] to determine whether genuine issues of fact exist. *Id. at 248-49*.

*HN2*[⬆] The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Childers v. Joseph, 842 F.2d 689, 694 (3d Cir. 1988)*. The moving party's burden may be

discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex, 477 U.S. at 325*. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings and designate specific facts, by use of affidavits, depositions, admissions, or answers to interrogatories, showing that there is a genuine issue for trial. *Id. at 324*. Moreover, [*10] when the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp., 812 F.2d 141, 144 (3d Cir. 1987)* (quoting *Celotex, 477 U.S. at 322*). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White, 862 F.2d at 59* (quoting *Celotex, 477 U.S. at 322*).

## III. *DISCUSSION*

### 1. *Access to the Facility*

The right of access to facilities is established in the DD Act under *HN3*[⬆] *§ 6042(a)(2)(H)*. The Act states that the PP&A must "have access at reasonable times and locations to any resident who is an individual with a developmental disability in a facility that is providing services, supports, and other assistance to such a resident...." *42 U.S.C. § 6042(a)(2)(H)*. According to *HN4*[⬆] *45 C.F.R. § 1386.22(g)*, [6] the PP&A shall have the following right of access:

g. Under *[§ 6042 (a)(2)(H)]* of the Act, the system [7] and all of its authorized [*11] agents shall have unaccompanied access to all residents of a facility at reasonable times, which at a minimum shall include normal working hours and visiting hours, for the purpose of:
(1)Providing information and training on, and referral to, programs addressing the needs of individuals with developmental disabilities, and the protection and advocacy services available from the system, including the name, address, and telephone number of the system and other information and training about individual rights; and
(2) Monitoring compliance with respect to the

---

[5] Although this is a bench trial, the Court's role on summary judgment is no different. *In re: Unisys Savings Plan Litigation, 74 F.3d 420, 433 n.10 (3d. Cir.), cert. denied, 519 U.S. 810 (1996)*.

[6] The implementing regulations for the DD Act.

[7] ...stem refers to the PP&A.

EXHIBIT
9
tabbies

rights and safety of service recipients.

*45 C.F.R. § 1386.22(g)*(emphasis added).

Defendants first argue that they have not violated the DD Act by denying access because the plaintiff never had the authority to the access they requested. In support of this they argue that the plain language of the regulation states that PP&A is only entitled to access [*12] to facilities and residents for the limited purposes of: (1) providing information, training, and referral to programs addressing the needs of individuals with developmental disabilities and the P&A services available from the system, and 2) monitoring compliance with the rights and safety of those persons who are recipients of the advocacy services. They argue that since none of the students are recipients of the services offered by the PP&A, and PP&A was not there to provide information, PP&A had no right of access to violate. Defendants' argument has added the word advocacy to the services described in part 2 of the above regulation, and the Court thinks this is misplaced.

No Court has ruled as RG is asking this Court to rule, specifically that the PP&A only has the right to access the facility to monitor compliance with respect to the rights and safety of those persons who are recipients of the advocacy services, nor does the statute so require. The statute to which *45 C.F.R. § 1386.22* applies, as outlined above, states that the PP&A must "have access at reasonable times and locations to any resident who is an individual with a developmental disability in a facility that is providing [*13] services, supports, and other assistance to such a resident" *42 U.S.C. § 6042(a)(2)(H)*. It is clear by the plain language of the statute that it is not advocacy service recipients for whom the PP&A is to monitor compliance, but residents of facilities that provide services to individuals with developmental disabilities. The language of the implementing regulation cited above is entirely consistent with the Court's reading of the statute. The reading of the implementing regulation suggested by defendants is contrary to the language of the regulation, as indicated by their addition of a word that does not appear in the regulation, and more importantly, contrary to the plain language of the statute.

The issue thus becomes what conditions a facility may impose on a P&A regarding access. More specifically, can a facility require an appointment prior to the PP&A having access to the facility. The implementing regulation clearly states that PP&A should have unaccompanied access to all residents of a facility at

**reasonable times, which at a minimum shall include normal working hours an visiting hours.** PP&A insists that this language gives them the right to enter a facility at any time [*14] during business and visiting hours. RG, on the other hand, insists that the phrase "reasonable times" means that they can impose reasonable restrictions on the times in which PP&A may come, and certainly requiring that an appointment be made in advance is reasonable.

Few cases have been decided on this issue, and none are directly on point. Regardless, both parties argue that the decided cases support their respective positions. In *Mississippi Protection & Advocacy System, Inc. v Cotten, 929 F.2d 1054 (5th Cir. 1991)*, the Court upheld a trial court's injunction which, *inter alia*, imposed time and place restrictions on the Mississippi P&A. In the underlying case, the district court, after reviewing an access policy that was extremely limiting to the Mississippi P&A, including, among other things, restricting P&A's access to people who were already clients, and forcing residents to undergo pre-interview and debriefing in response to a meeting with a P&A representative, the court ordered the defendants to submit a proposed order to the court outlining MP&A access to the facility. *Mississippi Protection & Advocacy System, Inc. v. Cotten, 1989 U.S. Dist. LEXIS 17075, 1989 WL 224953*, (S.D.Miss.). The Court [*15] said that such policy "should provide for regular and frequent opportunities for MP&A to visit Boswell and speak with residents on an informal basis. While it is not required that MP&A have access to all parts of the facility at all times, provisions must be made for reasonable and frequent access to all residents." *Id*. The Court continued, "the policy should also provide that if an incident of abuse and neglect is reported to MP&A, or if MP&A has probable cause to believe it has occurred...MP&A will have reasonable and prompt access to the Boswell facility and to all potential witnesses of the abuse or neglect. *Id*.

The plaintiff cites the above case for the proposition that the facilities variety of access restrictions on P&A "could only create a chilling effect of gigantic proportions." *929 F.2d at 1057*. It cannot credibly be argued, however, that RG's demand that PP&A make an appointment is even remotely comparable to the litany of restrictions in *Cotten*.

The defendants cite the above case for the proposition that time and place restrictions designed to minimize interference with the facility's programs are reasonable. Unfortunately, the court does not specify exactly [*16]



what restrictions were considered reasonable. Further, the district court drew a distinction between access to residents in the normal course of business, and facility access in response to a complaint or probable cause. As such, it is unclear exactly what restrictions were found to be reasonable, although restrictions on access to the residents of a facility so as not to disrupt their routine inherently seem more reasonable than general access to a facility where there is reason to believe abuse or neglect is ongoing.

This concept has support in two other cases decided by federal courts. In *Michigan Protection & Advocacy Service v. Miller, 849 F. Supp. 1202 (W.D.Mich. 1994),* the district court upheld a resident access regime whereby the Michigan P&A indicated a willingness to schedule interviews with DSS residents to minimize interference with the programs offered by the facility for the residents. *Id. at 1208.* In discussing the appropriate level of facility access the Michigan P&A was entitled to, the district court felt the issue was complicated and referred the issue to two special masters pursuant to *Fed. R. Civ. P. 53. Id. at 1210.*

In *Robbins v. Budke, 739 F. [*17] Supp. 1479 (D.N.M. 1990),* the district court found that the P&A's ability to observe the conditions that the patients are subject to is "seriously hindered by the requirement that any tours of the facility take place only with advance notice and only with an administrative chaperon" *Id. at 1488.* Again, however, scheduling appointments with patients the P&A wished to see to discuss their individual cases was an approved restriction to access.

Defendants argue that the requirement P&A first make an appointment is reasonable because the school must maintain a structured daily protocol, and the schedule should not be disrupted without first giving the staff a chance to inform the students that visitors will be expected on a particular day at a particular time, reducing the stress on the children. They rely on *Michigan Protection & Advocacy Service, Inc. v. Miller* for the proposition that Courts considering the scope of P&A's reasonable access have acknowledged that a "defendant's practical concerns are important and must be considered in shaping the parameters of access to facilities." *Id. at 1208.* The Court agrees that these are relevant concerns, and considers them in resolving [*18] this question.

The statute mandates, *inter alia,* that the PP&A shall have unaccompanied access to all residents of a facility at reasonable times to monitor compliance with respect

to the rights and safety of service recipients. *45 C.F.R. § 1386.22(g).* Based on the language of the statute, and the above cases, the Court finds that HN5[↑] reasonable access includes general facility access without notice, and patient access with twenty-four hour notice. The Court agrees with the court in *Robbins* that tours of the facility to monitor conditions that the patients are subject to are "seriously hindered" if they were to take place only with advance notice. *Id. at 1488.* Regarding access to patients, the Court agrees with the defendants that, bearing in mind the nature of the students at the school and the importance of their daily protocol, it is not unreasonable for plaintiff to make an appointment prior to seeing students. As such, the Court will grant plaintiff's motion to the extent that PP&A will have access without an appointment to tour the facilities, and deny plaintiff's motion to the extent it requests access to the students without an appointment.

Although the defendant [*19] did not move for summary judgment, the Court sees no purpose to having a trial on this issue as this case is to be tried to the Court. The Court finds that the are no facts in dispute regarding this issue, and makes this ruling as a matter of law. Accordingly, judgment will be entered consistent with the Court's ruling on the above issue.

### 2. Access to Records

Next, plaintiff argues that they have the right either to access the records of the residents at RG, or at a minimum have a right to a list of the guardians of the residents so they may contact the guardians for individual record access. HN6[↑] The relevant portion of the Act states that the PP&A may gain access to school records as follows:

> (2) such system must-
>
> (I) have access to all records of-
>
> (iii) any individual with a developmental disability who has a legal guardian, conservator, or other legal representative with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy whenever-
>
> > (I) such representatives have been contacted by such system upon [*20] receipt of the name and address of such representatives;
> >
> > (II) such system has offered assistance to such representatives to resolve the situation; and



EXHIBIT
9

(III) such representatives have failed or refused to act on behalf of the individual....

*42 U.S.C. § 6042(a)(2)-(I)*.

HN7[↑] The regulation further states:

If a [P&A] is denied access to facilities and its programs, individuals with developmental disabilities, or records covered by the Act it shall be provided promptly with a written statement of reasons, including in the case of a denial for alleged lack authorization, the name and address of the legal guardian...of an individual with developmental disabilities.

*45 C.F.R. § 1386.22(I)*.

Plaintiff contends that the defendants must provide a list of the names and addresses of the legal guardians of the RG residents [8] based on their answer in this matter, where RG admitted refusing PP&A's requested access to either the records or a list of all guardians because PP&A did not provide any justification or authority for said demand. According to PP&A's reading of the statute and accompanying regulations, this denial for lack of authorization is sufficient [*21] to mandate that a list of the guardians be provided. PP&A further argues that they have both received "complaints" and have "probable cause" [9] as defined by the Act to entitle them to record access. Regarding probable cause, PP&A argues that they have been in the facility several times and have witnessed and documented instances of apparent abuse and neglect, and have seen several instances where the health and safety of residents appeared to be in serious jeopardy. Plaintiff cites *Ala. Disab. Adv. v. Tarwater Develop. Center, 97 F.3d 492 (11th Cir. 1996)* in support of its position, arguing that in *Tarwater* an anonymous telephone call implying abuse and neglect established a complaint and probable cause under the DD Act, justifying access to records.

---

[8] Every resident of RG has a guardian.

[9] Probable cause is defined as:

[A] reasonable ground for belief that an individual with developmental disabilities has been, or may be, subject to abuse or neglect. The individual making such a determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect.

*45 C.F.R. § 1386.19*.

[*22] Royer Greaves contends that PP&A is not entitled to a list of guardians because PP&A never established a right to review the records of all RG students, which is what they requested. RG points to the language in the statute which grants PP&A the right to access the records of an **individual** with a developmental disability, and the records sought must be of an **individual** with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the **individual** is in serious and immediate jeopardy. *42 U.S.C. § 6042(a)(2)-I(iii)*(emphasis added). Based on this language, RG argues PP&A must request records of individual residents for whom a complaint has been received or probable cause exists, not the general request for all records PP&A has made. RG rightly points out there is no evidence PP&A ever requested the records of a specific individual, or cited a complaint or made a determination of probable cause regarding a specific individual. RG further argues that there is nothing in the Act or regulations to suggest that PP&A has the authority to demand access to all records for a general investigative [*23] purpose, but is instead limited to individuals PP&A has reason to believe have suffered some incident of abuse or neglect, either through a complaint or a determination of probable cause. Defendants argue that the *Tarwater* decision cited by the plaintiff supports defendants' position regarding the requirement of complaints and probable cause being directed towards an individual. In *Tarwater*, the 11th Circuit found that an anonymous telephone call constituted both a complaint and established probable cause. The anonymous call identified two residents whose deaths were suspicious. The Court relied in part on the specific information provided by the caller regarding the two individuals in finding the call sufficient to establish both a complaint and probable cause. RG argues that the Court in its holding agreed that a probable cause determination must be made with respect to a specific individual.

Since, according to RG, PP&A never had a right to access the records because a specific individual was never identified, PP&A has no right to a list of guardians. RG contends that the language in *45 C.F.R. § 1386.22(I)* does not demonstrate an entitlement to a list of guardians because [*24] the records request made by the PP&A was not covered by the Act. The regulation states in pertinent part, "if a system is denied access to...records covered by the Act, [the system] shall be provided promptly with a written statement of reasons, including, in the case of denial for alleged lack of authorization, the name and address of the legal



EXHIBIT
9

guardian...." *Id.* The requested records are not covered by the Act, according to RG, because the Act does not contemplate providing access to all records, but instead only contemplates access to individual records based on complaints or probable cause.

Regarding access to records, the Court is persuaded by the defendants' argument and has little trouble concluding that PP&A has not demonstrated any basis entitling them to access to the records of all of the students. The Act provides two situations where a P&A can gain access to records of individuals with disabilities who have a legal guardian. The first provides that a P&A must have access to all records of "any individual with developmental disabilities who is a client of the system if such individual, or the legal guardian...has authorized the system to have such access[.]" *42 [\*25] U.S.C. § 6042(a)(2)-* I(I). Based on this statute, a guardian of an individual who is a client of the P&A may authorize the P&A to have access to the records of said individual for any reason. In the instant case, however, there is no argument made that any of the individuals are clients of the P&A. The second avenue for a P&A to gain access to the records of a individual with a developmental disability is at issue in this case, and *HN8*[🔼] it provides, as stated supra, that a P&A system must have access to all records of-

> (iii) any individual with a developmental disability who has a legal guardian...with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy whenever-
>
> (I) such representatives have been contacted by such system upon receipt of the name and address of such representatives;
>
> (II) such system has offered assistance to such representatives to resolve the situation; and
>
> (III) such representatives have failed or refused to act on behalf of the individual....

*42 U.S.C. § 6042(a)(2)-*I(iii). [\*26] It is evident from the structure of *§ 6042(a)(2)-*I(iii) that this section is designed to give a P&A access to records where they have received a complaint and/or have probable cause regarding an individual, and the guardian has been contacted by the P&A and does not grant permission or refuses to act. The language of this section of the Act is clear, and it contemplates access to records when the PP&A either receives a complaint regarding an

individual resident, or has probable cause to believe that the health or safety of an individual is in serious and immediate jeopardy. Further, the reliance by the court in *Tarwarter* on the specific wrongdoing alleged with respect to two individuals who died at while in residence in a facility supports defendant's position, although it does not affirmatively state that the complaint or probable cause determination must be made regarding an individual for record access. None of the evidence submitted by the plaintiff [10] even suggests that they received a complaint regarding an individual or had probable cause to believe that the health and safety of any individual resident was in jeopardy, but instead merely suggests that there were complaints [\*27] or that PP&A had probable cause to believe that there were unsafe conditions at RG, conditions for which they are obligated to visit the premises to investigate. Should their investigations lead them to believe that an individual resident is in jeopardy, at that time they have the right to request to see the records of that individual. Based on the foregoing, PP&A has not established an entitlement to the records of any students, and the Court will deny their motion and grant summary judgment in favor of the defendant. [11]

[\*28] Whether or not PP&A has a right to a list of guardians is a closer question. The defendants argue that, unless PP&A has demonstrated a right to the individual records based on a complaint or probable cause, the defendants are under no obligation to provide the PP&A with the name and address of the guardian of that individual, let alone an entire list of guardians. They base this argument on the language in *45 C.F.R. § 1386.22(l)* and the phrase records "covered by the Act". The plaintiff, on the other hand, essentially argues that, if a P&A has made a request for records, and the facility denies it for lack of authorization, the PP&A is entitled to a list of guardians. This argument is

---

[10] The obvious deficiencies in plaintiff's evidence is of no moment for purposes of deciding the instant motion.

[11] This ruling today should not be read to hold that there are no circumstances under which a P&A could have a more generalized access to records. For example, the Court can envision a situation where a P&A receives complaints of serious widespread abuse against numerous residents, or has probable cause to suspect that the health and safety of numerous residents is in serious and immediate jeopardy. Should such a situation present itself, it could warrant a P&A to have a more generalized access to all of the records to properly investigate. However, even accepting as true all of the hearsay allegations contained in plaintiff's affidavits, their allegations do not even begin to approach such a situation.

EXHIBIT
9
tabbies

also made pursuant to _45 C.F.R. § 1386.22(l)_.

The Court agrees with the plaintiff that the focus for this inquiry should be whether or not the denial was for a lack of authorization, and not whether or not the records are covered by the Act. Defendants' reading of the statute attempts to limit reach of the phrase "covered by the Act" to records relating to an individual a P&A has received complaints about or has probable cause to believe is in serious jeopardy. The language in the regulation clearly **[*29]** intends a much broader reach, and is intended to encompass all individuals, facilities, and records of individuals in the state system designed to meet the needs of said individuals. As such, the records requested by plaintiff are covered by the Act, and the relevant inquiry is the reason for denial.

Since plaintiff did not have probable cause to see the records of any individual students, and since there are no allegations made that any of the students are clients of the system, any argument remaining for PP&A to have access to a list of guardians must rely on _45 C.F.R. § 1386.22(l)_. As stated _supra_, the regulation says in pertinent part that, "[]f a system is denied access to…records covered by the Act it shall be provided promptly with…in the case of a denial for alleged lack of authorization, the name and address of the legal guardian…. _Id._ There is no dispute that one of the reasons given for the refusal to provide plaintiff access to records was a lack of authority. The plain language of the regulation has been satisfied by the undisputed facts of this case, suggesting that plaintiff should receive a list of guardians from RG.

This logic of this conclusion **[*30]** suggests that all a P&A must do to receive a list of guardians is to ask for it. Such a conclusion gives the Court pause for the simple reason that, if the Act intended such a result, it could have been more affirmatively and clearly stated. The question thus becomes whether or not the Act and this regulation contemplate giving to PP&A a list of guardians when the PP&A has not demonstrated sufficient probable cause entitling it to the records per the discussion above, and when the residents are not clients of the system. The Court believes it does, and this conclusion is supported by the regulation, by precedent, and by the policy underlying the Act as demonstrated by the facts of this case.

The regulation as it relates to records has a minimal applicability to _§ 6042(a)(2)_-l(iii) because implicit in the statute is the notion that if a complaint or probable cause is established, the name of a guardian must

automatically be turned over to the P&A so the P&A can contact the guardian to offer assistance. Furthermore, a guardian would not have the authority to deny access to the records of an individual for whom this section is satisfied, as this section is designed to give the P&A a **[*31]** right to access in the event a guardian is not responsive or cooperative. As such, this regulation could not have been drafted with _§ 6042(a)(2)_-l(iii) as its focus. The regulation potentially has even less applicability where a guardian of an individual who is a client of the P&A grants access to records. It is not likely, and probably not even possible, that an individual with a developmental disability who has a guardian could become a client of a P&A without the guardian being involved in the decision. _A fortiori_, if the person is a client, the P&A has the name and address of the guardian. Therefore, even if a facility informs a P&A that the P&A no longer is authorized access to the records of one of the P&A's clients, there is no need for this regulation since the P&A will already have the guardians name and address.

The regulation then must be intended to address the situation where a P&A requests to see the records of a resident or residents at a facility, but is unable to provide a sufficient basis of complaints or probable cause to warrant access, and the resident or residents are not clients of the P&A. In such a situation, the P&A would need the permission of the guardian **[*32]** to see the records, but conceivably would not know how to contact the guardian, and the facility can simply deny access by telling the P&A that they are not authorized to view the records. This is the situation presented in the instant case, and the only remedy is to provide the P&A with the names and addresses of the guardians.

This reading of the regulation is consistent with the Act. _Section 6042(a)(2)_-l(iii) addresses a discreet situation whereby a P&A has received a complaint or has probable cause to suspect that the health and welfare of an individual student is in such serious jeopardy that the P&A will ultimately have access to the records of the resident even in the face of an objection by the guardian. Although plaintiff attempted to implicate this section as a basis for gaining access to the records, and the defendants were successful in demonstrating that it was not satisfied, it is not the sole avenue to obtaining access to records. _Section 6042(a)(2)_-l(l) necessarily assumes that the P&A already has the name and address of the guardian since it addresses access to records when authorized by guardians. The Court's reading of the regulation, therefore, merely fills in **[*33]** a large gap not affirmatively addressed by the Act but so



EXHIBIT
9
tabbies®

obvious that it most certainly was contemplated by its drafters, namely what are the rights of the P&A when it does not have sufficient probable cause to demand access to records, and it does not know the guardians from whom it must obtain permission.

Although the practical result of this ruling is that all a P&A need to do is to receive a list of guardians is ask for it, and admittedly such a result could be more clearly indicated by the Act and regulations, this Court is not the first to read the statute as requiring such a result. In *Robbins v. Budke, 739 F. Supp. 1479 (D.N.M. 1990)*, the district court ordered the defendant facility to post in the administration building at a location that is accessible to the P&A during regular business hours a list of patients for whom guardians have been appointed along with the name, address, and telephone number of each guardian, and the instruction that the P&A may contact a guardian when necessary to obtain consent or discuss patient issues. *Id. at 1489*. As the *Robbins* decision demonstrates, the Court's decision today to provide PP&A with a list of guardians is not a novel [*34] one.

Finally, the policy underlying the Act to protect the developmentally disabled and the incongruous outcome that would otherwise result support the Court's ruling, and is illustrated by the affidavit of Defendant Carol Dale describing the access permitted to PP&A. When PP&A attempted to access the records of the students, they were rightly refused access because PP&A did not have the appropriate authority. According to the affidavit, Ms. Dale did introduce the PP&A representatives to the one student over 18 and capable of responding to a request by the PP&A to review his or her individual records. The student consented, and the PP&A reviewed his records. The other students all have legal guardians, and without the name of the legal guardians, the PP&A was unable to obtain consent for access to the records of those residents. The result is that the one student who was considered able to speak for himself is the one who received the benefit of the PP&A services, and the others, who were unable to speak for themselves, were denied these services. This result is contrary to the purpose of the Act.

If PP&A has concerns about the health and welfare of the residents at a facility, and [*35] those residents are not clients, the Act cannot be interpreted to require them to wait until they have received a complaint or have probable cause to believe that an individual's health and welfare is in serious and immediate jeopardy before having an opportunity to act on behalf of the residents.

PP&A's mandate is to be the advocate for all individuals with developmental disabilities, not just those who become their clients. Their statutory duty is best discharged, and the interests of the individuals with developmental disabilities is best protected if PP&A has an opportunity to advocate long before any individual is in serious and immediate jeopardy.

Accordingly, the Court holds that PP&A is entitled to be provided with a list of guardians, and will grant summary judgment in favor of the plaintiff.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant plaintiff's motion to the extent that plaintiff seeks access to Royer Greaves without first having to make an appointment, and to the extent plaintiff requests a list of guardians of the Royer Greaves students. The Court will deny plaintiff's motion and grant summary judgment in favor of the defendants to the [*36] extent that plaintiff will be required to make an appointment twenty-four (24) hours in advance of meeting with individual students, and to the extent that plaintiff has not demonstrated an independent right to access the records of the students.

An appropriate Order follows.

Clarence C. Newcomer, J.

## ORDER

AND NOW, this 24th day of March, 1999, upon consideration of plaintiff's Motion for Summary Judgment and defendants' response thereto, and consistent with the foregoing Memorandum, it is hereby ORDERED that said Motion are DENIED in part and GRANTED in part. IT IS FURTHER ORDERED that plaintiff's motion is GRANTED and JUDGMENT is entered in favor of the plaintiff to the extent that plaintiff seeks access to Royer Greaves during normal working and visiting hours without prior notice or appointment, and to the extent plaintiff requests a list of the legal guardian of the Royer Greaves residents and students. IT IS FURTHER ORDERED that defendants shall provide plaintiff the name and address of the legal guardian of each resident and/or student at the school within ten (10) days of the date of this Order. IT IS FURTHER ORDERED that plaintiff's motion is DENIED and JUDGMENT [*37] is entered in favor of the defendants to the extent plaintiff shall be required to make an appointment twenty-four (24) hours in advance of meeting with individual students and/or residents, and to the extent plaintiff sought access to the records of the

**EXHIBIT**
**9**

Royer Greaves students and/or residents. IT IS
FURTHER ORDERED that the Clerk is to mark this
case CLOSED.

AND IT IS SO ORDERED.

Clarence C. Newcomer, J.

**End of Document**

